Our third case today is Pratt v. Wisconsin Aluminum Foundry, appeal number 24-1901. Mr. York, whenever you're ready. Good morning. My name is Nicholas York of Allen C. Olson and Associates, and we represent the plaintiff appellant Debra Pratt. Ms. Pratt brought claims of discrimination and retaliation under Title VII of the Civil Injury Company. On summary judgment, the district court dismissed Pratt's claims based on a flawed and incomplete analysis of the record. We ask this court to reverse the district court and allow Ms. Pratt to bring her claims to trial. Each of Ms. Pratt's claims is well supported by existing Seventh Circuit precedent and the facts of the case. This case doesn't require a novel legal theories or extensions of- Mr. York, can I ask you some questions about that, about your legal theories in this case?  I want to focus only on the retaliation claim, okay? She proceeded under the McDonnell-Douglas burden-shifting framework, I think, and the first element of the prima facie case is that she engaged in activity protected by the statute, meaning she opposed sex harassment, okay? The way I understand it, your argument is, it seems to me that you concede, at least in your reply brief, that just because you're a human resources manager and you report sex harassment or what you perceive to be sex harassment doesn't mean that you opposed it. Is that right? I think that's certainly correct, and I think Ms. Pratt's certainly opposed- Right, I know that's your argument, but you concede at least, just, your argument is not that just based on her position as a human resources manager, she necessarily opposed harassment by reporting it, right? Our argument is that she herself reported harassment against herself, and in making those reports, necessarily opposed sex-based harassment. Okay, and you concede, I think, that the sex harassment that she opposed was not severe under our case law? I don't think we do concede that. Well, what about it, okay, what's your best case for the position that anything that she opposed was severe under our case law? Certainly. I don't think, one, that you need to look at any specific instance of harassment or discrimination. Well, that's pervasive. And so, I would say the most severe instance of discrimination she opposed was actually race-based discrimination. If we look at the situation involving- Did you make a race claim? No, he made a claim for retaliation in general of under Title VII, and she, my concern is that the district judge seems to have overlooked a number of the instances of protected activity that were identified in your brief and summary judgment materials, including the Yang race incident. I think that's absolutely correct. There's no doubt about that, but we're Article III judges, can't we consider them? I mean, I'm with you, the district judge ignored some of that, and he didn't explain the sham affidavit rule and things like that. There's no doubt the district judge overlooked some of that stuff, but can't we consider it on appeal? I think you certainly can, but I think, again, looking at the record as a whole, the examples of discriminatory and harassing conduct that she opposed were both severe and pervasive. And I say severe and pervasive, but the case law only requires one. And so- Does the case law for retaliation, does the case law require the plaintiff to show that the conduct opposed actually amounted to a violation of Title VII? The case law only requires that a plaintiff have a subjective belief. Reasonable and subjective belief, correct? Correct. We've said that time and again. And is it also correct that when you're dealing with instances of harassment and the kind of an environment that Ms. Pratt described in her deposition, that there can be cumulative effects, that no single instance has to violate Title VII in order to add up to a concern? In this court's employment policies, for example, we try to deal with harassment incidents long before they might become legally actionable. I think that's absolutely correct. We're looking at all of the evidence that suggests retaliation or discrimination as one pile, and the question before this court and before the district court is whether a reasonable fact finder could find that an inference of discrimination or retaliation was appropriate. And again, there are severe examples of discrimination and retaliation that Ms. Pratt complained about, and these weren't things that were brought to her as an HR manager. These are independent issues that she is identifying. Mr. York, what's your best argument that a reasonable person would have believed that anything on which she complained altered the work environment? I would say with regard to a manager that was discriminating on the basis of race, she reported that he had both fired and attempted to fail to promote an employee based on race and had directly said that it was because of their race. This is Mr. Culp. He had first told an employee that he was going to be denied a promotion because he was Asian. He then disciplined a Hispanic employee wrongfully a few days later. And then third, this same manager fired an African-American employee with no basis. Wait, wait, wait. I think these, at least, I didn't get this from your brief. I thought that her complaint was that he fired a Hispanic employee without HR process. Not because he was Hispanic. Which is it? So it is that she believed that there was racial discrimination at play. Why did she believe that? She believed that there was racial discrimination because there was a clear pattern of him treating minority employees differently than he treated white employees. So and you can point to, wait, the clear pattern is him firing an Hispanic employee without HR process, him mentioning to Cedric Yang that he was passed over promotion because he was Asian, which I think she conceded it may have been a joke, and that he wrote up a black employee for inaccurate reasons. That's it, right? That's it. Along with not, I guess, pursuing similar actions or having any similar reports involving his white subordinates. Yes, he was treating his minority employees differently than his employees who were, yeah, white employees. And that's the basis of a discrimination issue under Title VII. Ms. Pratt independently reported that that discrimination issue was occurring and that she was concerned that the company was discriminating against workers on the basis of race. That is, I would say, the clearest example of severe conduct. And again, there's certainly pervasive conduct here as well. Do you think that any of these instances amount to severe under our case law? I think... Which ones? I think firing an employee on the basis of their race. That's a category mistake. We don't ask about, if somebody's fired because of their race, it violates Title VII, period. We don't ask about severity or mildness or et cetera. Now, maybe it was a joke, maybe it's not that the jury would have to decide that, but you would have to have, quote, we don't distinguish between severe and mild instances of discrimination. That's a hostile environment category. Yeah, I guess I think that's... Yeah, but I'm unclear again on what is her argument, that she opposed what? She opposed discrimination on the basis of race along with discrimination based on sex along with a hostile work environment. I would say she opposed numerous categories of action prohibited by Title VII, made these reports directly to her supervisor, tied these reports to retaliation she was suffering in the workplace, and then after tying it all together in an email, was fired a week later. That's the nature of our claim here. It looks like I have... We'll give you some rebuttal. Sorry, what was that? We'll give you some rebuttal. Oh, thank you. You're welcome. All right. Okay, Mr. Dristol, McEachron. Thank you, Your Honor. May it please the Court. Jim Dristol, McEachron on behalf of the EEOC. I'd like to address three issues today. First is that human resource managers are not subject to a different protective activity standard than other employees. Second, the appropriate hostile work environment standard. And third, how a jury could find under the appropriate protective activity and hostile work environment standards that Pratt can engage in protective activity. I'd like to pick up with a couple of questions that the panel had with regard to the acts Ms. Pratt complained of, and I'll turn it over to you, Mr. McEachron.       Thank you, Your Honor. To engage in protected activity, it's critical to note that Title VII does not require the discrimination to be complete for the protections from retaliation to kick in. When one opposes employment discrimination that's in progress or a conduct that if repeated could rise to the level of a hostile work environment, that may be protected activity. So that's one of the errors that the district court made here in assessing whether or not Ms. Pratt engaged in protected activity that opposed the hostile work environment. While the district court assessed using a hostile work environment standard, it looked for a complete hostile work environment, and it articulated the standard as the foundry concedes as requiring severe and pervasive harassment. Of course, that's severe or pervasive, and that standard is a sliding scale. The more pervasive the acts of harassment are, the less severe they need to be, and vice versa. The district court also looked for an intent to harass, and that is not an element of a hostile work environment claim. That claim focuses on the subjective and objective effect of the harassment. So when assessing those acts, the district court looked for evidence that was not relevant to the claim, did not examine all the acts as this panel has already discussed, a potential harassment that Ms. Pratt reported was a potential sex discrimination and harassment and race discrimination. And the panel asked earlier about the human resources manager role, whether it made a difference whether or not Ms. Pratt was a human resources manager, and it's our position that it does not. The foundry continues to argue on a pew that her job duties limit her opposition. Could you focus on, let's say, the Second Circuit's opinion in Littlejohn, or do you agree with the approach that court took in that case to an HR manager's retaliation claim? Your Honor, Littlejohn's a complicated case. It starts by explicitly rejecting the human resources manager role. I believe that's on page 317 and note 16 of the opinion. Because it says job duties are an apposite to the opposition. There's no statutory text for excluding HR personnel. Exactly right. And you can see that in the decisions in Patterson, DeMasters, and Cropp, and excuse me, Jackson as well. But Littlejohn nonetheless goes on to say that human resources managers have to actively support people complaining of discrimination because of their job duties. So there's two errors in that analysis. The first is it's already concluded, consistent with the Sixth Circuit and the Eleventh Circuit, that job duties do not affect whether or not someone engaged in a protected activity. As you noted, that's entirely consistent with the text of the statute, which contains no exception or modification for HR managers. It also requires active and consistent support. But the Supreme Court in Crawford rejected an earlier Sixth Circuit opinion that said that opposition needed to be active and consistent. So we would argue that the Second Circuit was correct to say that the manager rule doesn't apply. And for the very same reasons articulated about the manager rule there, you should not look for more for protected activity for HR managers. Like every other employee, they should be held to the Crawford standard. Would you agree that relaying another employee's complaint is not sufficient by itself? That's a fact-specific analysis. Our focus would be how that stacks up. Does the communication, excuse me, communicate a reasonable good faith belief that an unlawful employment practice is occurring? Some reports of discrimination may do that, and some reports of discrimination may not. But the point is that you want to analyze those communications under the same standard that Title VII provides to protect all employees from retaliation. As the Court noted earlier, that's consistent with the requirements for early reporting set out in Farragher-Ellis. We do want reports of harassment to take place earlier rather than later, and we don't want to put employees and HR managers in Catch-22s where they would be subject to retaliation for trying to report early harassment. Briefly, applying those correct standards, so looking for the hostile—when the District Court assessed the hostile work environment standard, we went through the legal errors it made. We do think that this should go back for a fact finder to determine whether or not Ms. Crack engaged in protected activity. She made repeated reports of sex-based discrimination and harassment, and reports of race discrimination. And a jury could find that she subjectively believed those reports constituted discrimination, and that she had an objective belief in that, that that conduct, for example, with the sex-based harassment that it repeated would constitute a hostile work environment. And the same is true with regard to the race discrimination. When you report that a promotion decision may have been made because of race, that is the kind of—if I may finish my sentence, I apologize.  That is the kind of communication that Crawford said virtually always constitutes protected activity. Okay. Thank you. Thank you. Mr. Yellen. Good morning, Your Honors. May it please the Court. Mike Yellen on behalf of Eppley Wisconsin Aluminum Foundry. Judge Griesbach correctly granted summary judgment to the foundry here on Pratt's three separate Title VII claims—one, sex discrimination related to her termination, two, sex discrimination based on pay, and three, retaliation related to the termination of her employment. Counsel, I want to jump ahead to the retaliation claim. That's been our focus this morning. Question about the record. I saw the affidavit from Mr. Jacobs saying that he made the decision to terminate Ms. Pratt prior to March 7th. Is there any other evidence that was produced during discovery in the record that supports the timing of that decision being made before March 7th? There is not, and I would submit to you, Judge, that no other evidence is needed. That evidence is undisputed. Jacobs' declaration— Isn't it a little—it's a little vague, right? It says prior to— He didn't even remember when he fired her, when he was being deposed, right? He was not asked that, Judge, specifically. So— No? He asked, when did we terminate, and the response was, that's a question for you, right? If that's the testimony, I won't disagree with you, but with respect to the timing issue, which is how I understood your question, I apologize, Judge, there is no dispute that Mr. Jacobs, his declaration says, before I received that February 7th, 2019 email, I had already requested approval to terminate— You mean the March 14th email? Sorry, March 7th is— 7th email, sorry. Before I received that March 7th, 2019 email, I had already determined that I was going to terminate Pratt and had requested approval to do so. That declaration is based on personal knowledge of a concrete event. He's saying one thing happened before another. But was it via email? Was it in a phone conversation? Who was it to? I mean, it's so vague. I would disagree with that respectfully, Judge. Those questions could have been asked at his deposition if there was any basis, if that was disputed by Ms. Pratt. But didn't Judge Hamilton just say he didn't remember at his deposition? He wasn't asked about when specifically did you make that decision? Was there an email chain about it? Was it a telephone call? Those questions weren't asked. So his declaration, which is based on personal knowledge, stands unrefuted. There was obviously a lot of protected activity before the March 7th email as well. Could I ask you about the sex discrimination case regarding termination? The district judge seemed to think that claim was waived. Pages 3 through 9 of Plaintiff's Summary Judgment Brief in the district court are all about that. And again, Judge, I would respectfully disagree. While the heading purports to address sex discrimination based on termination, the arguments are directed towards retaliation. When her comparators are all male in that discussion? For example, the other folks who were criticized in the UTEC report? There is a vague reference, yes, Judge, to unnamed comparators in the UTEC report. That's certainly true. It's a short list. I would submit to you, Judge, that that argument is perfunctory and not developed, and I believe Judge Griesbach made that point. What's the page limit for briefs in the Eastern District of Wisconsin? Thirty pages, I believe, Judge. Okay. Interesting. Okay. And she also identified a lot of protected activity in her brief that the district judge didn't seem to pay attention to, or at least discuss in his opinion. I would submit, and I don't know precisely what Judge Griesbach was thinking, but what I would say is . . .  Sorry. In our last case, the briefs referred to Chief Judge Pamela Pepper of the Eastern District of Wisconsin as Magistrate Judge Pepper, and you just referred to Chief Judge Griesbach. I'm a little confused as to who's who. I thought I knew in the Eastern District of Wisconsin, but go ahead. I'm sorry. Pamela Pepper, Judge Pepper, was the Chief Judge, if that has changed to Judge Griesbach. It has. I apologize. I don't believe at the time of this decision he was the Chief Judge, but I would submit that Chief Judge Griesbach focused on the February 18th investigation and the March 7th, 2019 email, because in her briefs to the district court, Pratt, with respect to causation, only argues that there was a causal connection between the February 18th investigation and the March 7th, 2019 email, and that would explain why Chief Judge Griesbach focused on those two events. Do you agree that a plaintiff can bring a retaliation claim without having to prove an underlying violation of Title VII? I do agree with that. I think the case law is clear that as long as she has both a subjective and objectively reasonable belief that discrimination is occurring, that would be fine. And would you expect an HR manager to take action on reported instances of harassment or race or sex-based hostility before they become severe or pervasive? I think the record is clear here, Judge, that that is certainly part of, was part of Pratt's job to investigate complaints that she received. I will say, while we're focusing on alleged protected activity, I think, you know, you asked about this incident with Cedric Yang, and there's no record evidence that that incident was reported to Mr. Jacobs. And same with this firing of the Hispanic employee in March of 2018. I don't think there's admissible record evidence that that was reported to Jacobs. And so, you cannot lump all of this protected activity together. You have to look at specifically what's being alleged, and as we argued in our brief, much of that is barred by the sham affidavit rule as well. And speaking of the sham affidavit rule, so I've read Ms. Pratt's deposition. What, where is she taking a position that is different from what she said in her deposition? I think we could, we call it out in paragraphs 25, 29, 34, 41, 50, and 54 of her responses to the Foundry's proposed findings of fact, and I do apologize, there's a numbering issue there. Somehow, our responses were off by one, but, you know, one example I have here is with how Pratt is attempting to characterize these events. So, if you look at paragraph 54 of Pratt's proposed findings of fact, she claims she reported this to Jacobs and told them it was unacceptable sexual harassment, but when you look at what she said in her deposition, there's nothing about sexual harassment there. Where is that in the deposition? What are you referring to? That's at page 203, 13 to 20. So, she says it's disgusting, but there's nothing in that deposition testimony about her expressly claiming that's sexual harassment. But that's, wait a minute, that's about Emily and Kohlbeck? Correct. I thought we were talking about the Boyd instance. I was giving you one example, Judge, but if you have questions about the Boyd investigation, I'm happy to address those as well. So, somebody needed to figure out that she needed to be more specific that a man sending a female employee a you-smoking-hot email was sexual in nature? Our dispute is that in her proposed findings of fact, she claims that she expressly said that was sexual harassment, and that deposition testimony doesn't support that, that she said this is sexual harassment. How detached from reality do we expect people to be in management? How explicit does the complaint need to be? Well, all we're saying is, in her proposed findings of fact, she's saying expressly that she reported that as sexual harassment, said it's sexual harassment, reported that. That was brought up with Ben, and I complained about that, how we, and I presume there, I would read kindly as women, were being treated. What more needs to be said there? How is that a sham affidavit? I'll move on from that point. What's your best one? In terms of the sham affidavit? I think there are a couple of different examples. So, one is that, particularly with respect to the issues we were talking about before, the write-up of a black employee and firing a Hispanic employee in March of 2018, neither of those, the testimony shows, were reported to Jacobs. There's no testimony about that. And I would submit to you, Judge. Was there, in essence, what I would call door-closing questioning of Ms. Pratt during her deposition, that I read a lot of instances where she's being asked things, she said, that's what I remember as of this moment, and I didn't see the door closed to future additions. I don't know specifically whether she was asked, is there anything else for each of you? Isn't that kind of essential if you're making a sham affidavit argument? I would respectfully say she was given an opportunity and asked to explain what she said at her deposition. She gave as complete a recollection as she could, and her affidavit attempts to add to that and change that. But in a way that Mr. Jacobs' affidavit, for example, about the timing of the firing decision does not? I would respectfully submit that those are two very different things. But I'll move on, because even if we concede that there was protected activity here, and you assume that there was, there's no evidence of causation. And specifically here, and below, Ms. Pratt argued there was causality as to both the February 2018 investigation and her March 7, 2019 email. That's all she talked about. So, with respect to the February 2018 investigation, as Judge Griesbach correctly concluded, that single event was not protected activity, because it involved a single, isolated joke. Even if it was protected activity, that happened over a year before Ms. Pratt was terminated in March of 2019. And yet, the decision to terminate her cited information on incidents that had occurred as much as a year before, correct?  The decision to terminate Ms. Pratt. So how is it causality for firing, but not for retaliation? I would respectfully answer that as this Court's jurisprudence with respect to causality makes very clear that a time gap of even a couple months is sufficient to rebut any inference of causation. Sometimes, but if the decision maker is showing a long memory, and the reasons he's taking for firing, I'm not sure that the Court should disagree. Can I ask you about the UTEC report? The UTEC group report? This has to do with the sex discrimination claim. Obviously, there's some quite critical things said about Ms. Pratt in that report. But as I read it, it's critical about virtually everybody. Everybody else in there is male, and she tells us that everybody else in there got good reviews and a bonus, and she got fired, including on lack of trust, right? I would respond to that a couple of different ways. There were other people who were mentioned in the UTEC report as having a lack of trust. Those people were all part of the executive team, so they weren't on her level. They were not direct reports to Mr. Jacobs. Including Mr. Jacobs himself, right? Correct. Lack of trust, confidentiality, shares information with others that was told to him in confidence. That's correct. But he fires her for it. Was Mr. Jacobs an HR manager? He was not. And Judge Kirsch, that's a great point, and I was going to bring it up in responding to Judge Hamilton, is all of the folks in the UTEC report had different jobs, different job responsibilities. And Judge Griesbach, Chief Judge Griesbach, went through and did a detailed review of that and found that all of the strengths and weaknesses for these various managers in different roles were much different than Ms. Pratt received. And I would also say the UTEC report was just one part of a bigger analysis of Ms. Pratt's performance, which included many other issues that none of the alleged comparators suffered from. Including whether she was doing a good job on benefits? That's right. Yes. And her 2018 performance review said that she did that well, correct? It said she was good on the benefits side, Judge. This is pretty messy, frankly. I think the reality is oftentimes in reviews you're looking for something good to compliment someone on rather than just only focusing on all negatives. I think the overall review is clear. Ms. Pratt received a 10 out of 32 on her overall ranking and a 0 out of 2 for honesty and integrity. And the honesty and integrity and trust issues are really what's critical here, particularly in her role as an HR manager. Counsel, I want to direct your attention to another email that Ms. Pratt sent. And that was on February 22nd of 2019 to Lori Herzog on the board. In that email she complains, in reference to the UTEC report, there was some good old boy club stuff going on. That sounds to me like a complaint of sex discrimination. How do you interpret that statement? I see my time is up. May I respond to that? Yes. Judge Kerr, you're permitted. Yes, yes, of course. I would say a couple of things about that. There's no evidence that, this is not a cat's paw theory case. It hasn't been argued or alleged. And so there's no evidence that Ms. Herzog was involved in Mr. Jacobs' decision to terminate. So I think even if Your Honor is correct that that was a complaint about sex discrimination, there's no causal link to the ultimate decision to terminate. Okay, thank you. Thank you, Mr. Yellen. Mr. Yerk, we'll give you two minutes to rebuttal.  Thank you. As an initial matter to address the sham affidavit issue, the incident that was cited to involving Mr. Culp, during her deposition, Ms. Pratt specifically referred to her notes that she kept contemporaneously when asked, you know, is there anything else you remember or questions to that effect? And in those notes, she makes it clear that By the way, just to be, the notes were being used at the deposition, right? Everybody had the notes. Correct. That is correct. Doesn't that deal with the sham affidavit issue? In the sense that it Everyone had them. Everything that she complained, everything she talked about in the affidavit was in the notes that everybody had at the deposition. They could ask any question they wanted regarding the notes, right? I believe that is correct. That's your point, right? I think it forecloses on the sham affidavit rule discussion. Yes, correct. And the district judge didn't rely on the sham affidavit rule, did he? I don't think the district judge did. The district judge simply didn't discuss those incidents at all. And so, we're left sort of searching for, you know, why were these disregarded? And that's why this sham affidavit rule Did you address Mr. Yellen's argument that regarding causation, that the only argument that Ms. Pratt made regarding causation was the February 18 events and the March 7th email? I don't think that's necessarily correct. I think that the chain of causation is longer and more detailed than that. I think those were the focus in replying to the summary judgment brief because those were the focus of the motion for summary judgment. And so, I think those were certainly discussed, but I don't think they were exhaustive and I don't think there's any argument they were exhaustive. They were examples. And I think discussing that March 7th email, there's sort of a conclusory allegation from Jacobs in his affidavit that he had made this decision sometime before March 7th when this email was sent. That's not supported by any documentation whatsoever. But it doesn't need to be. It's just supported by his testimony and that's enough. We have two things. Evidence consists of documents, witnesses. Documents, witnesses. Witnesses sworn testimony is the same as a document. You don't have to have documentary proof of everything. I certainly acknowledge one doesn't need documentary proof, but you need more than a sort of bald conclusory statement that you made this decision in some undetermined time in the past. Would that amount to the plaintiff as well? That the plaintiff can just say he's lying and that's enough to get to trial? I don't think so. And it's the same sort of issue. The plaintiff and the defendant should be held to the same standard there. Ms. Pratt had detailed and specific, and I see I'm out of time, can I respond? Go ahead, yes. Ms. Pratt had detailed and specific allegations grounded in time as to her reports. Their affidavit in response is simply we made this decision before that. No explanation, no support, no even detail that one could question him about as to when he made that decision. It's a conclusory statement and it shouldn't be given weight. What was the timing on Jacob's deposition, the affidavit, and the summary judgment briefing? Can I respond? Yes, yes, of course. Sorry, yeah. Of course, of course. So the deposition occurred before the summary judgment motion, and the summary judgment motion included the affidavit that we're discussing here. Okay, thank you. Okay, thank you, Mr. Yarbrough. The case will be taken under advisement.